TRUMAN E. STEVENS v. GEORGE E. PANTLIND AND
JOHN A. B. MEADE.

*Landlord and tenant—Surrender of premises—Directing verdict.*

The court is held to have erred in finding as matter of law, upon
plaintiff's testimony, that the defendants had surrendered pos-
session of a mill leased of the plaintiff prior to its destruction
by fire, and that its care had been assumed by the plaintiff;
plaintiff not having rested his case, and not claiming to be
entitled to recover upon the case then presented, and having
advanced no theory inconsistent with the case set forth in his
declaration.

Error to Osceola. (Judkins, J.) Argued July 1 and
2, 1891. Decided July 28, 1891.

*Assumpsit.* Plaintiff brings error. Reversed. The facts
are stated in the opinion.

*Charles A. Withey (C. H. Rose,* of counsel), for appel-
lant.

*Blair, Kingsley & Kleinhans,* for defendants.

MCGRATH, J. On the 14th day of May, 1888, plaintiff
leased to defendants—

"His entire saw-mill, together with all tools and sup-
plies on hand, also his team of horses, one set of trucks,
one wagon, and use of barn now occupied by him, for so
long a time as it shall take said second parties [defend-
ants] to cut what logs they have in the first party's
mill-yard, and lots adjoining; together with the right of
ingress and egress, along and upon all and every part of
said premises, for the purpose of doing said work. Said
first party also agrees to work in the mill under direction

of second parties, or their agent, at the rate of two dollars per day, so long as his work shall prove satisfactory to said second parties, but no longer."

In consideration of said lease and agreement, defendants agreed to pay plaintiff the sum of $500, and also to pay him at the rate of $2 per day for all the time that he should work in said mill. The lease contained these further provisions:·

"The parties of the second part further agree that, as soon as the job is completed, they will return the above property, with the exception of the supplies, in as good order and condition as it was when they received it, excepting natural wear and tear and damage by fire or the elements.

"It is further agreed that, should the mill be destroyed by fire, this lease and contract shall terminate and become void. The parties of the second part agree to keep a night watchman, and exercise due care and diligence to protect said property from fire, the same as though the property was their own."

Defendants operated the mill under this lease from May 14 until July 11, 1888, during all of which time plaintiff was employed as sawyer and filer in the mill, and lived upon the same premises within about 300 feet of the mill. It appears that when defendants took possession there were no accumulations of sawdust or slabs about the mill; that a box had been constructed on the south side of the mill to collect the surplus rubbish, and was so arranged that a wagon could be backed under the box to draw the surplus away, as plaintiff did when he ran the mill; that after defendants took possession the box was torn down in some way, and from that day on they allowed the sawdust to accumulate in great quantities around the mill, and threw the ashes from under the grate into the sawdust; that in the latter part of June a

fire had occurred in the mill; that the plaintiff had called
the superintendent's attention to the danger of allowing
the sawdust and slabs to accumulate, and he had prom-
ised to draw them away; that fire would smoulder in a
pile of sawdust for weeks, and perhaps months; that the
mill was shut down from June 30 to July 9; that before
the mill was shut down plaintiff asked the superintend-
ent if he intended keeping a watchman there while the
mill was shut down, and he said it was not necessary,
whereupon plaintiff told him it was dangerous to have
the property in that condition, and plaintiff said, "Under
the terms of the lease, the company is good if the thing
burns down;" that on July 11 defendants got through
cutting logs, laid off their men, and paid plaintiff for his
labor, but the balance of the rent was not paid until
July 23; that the sawdust and slabs had accumulated in
great quantities around the mill. Plaintiff testified as
follows:

"Mr. White did the paying. He came down to the
mill on July 11, and we went down into the engine-room
and around on the south-west side of the end of the
mill, the corner of the fire-room, and got to speaking
about the sawdust there, and the rubbish; and he asked
me what I would take to call the mill in as good con-
dition as it was when they received it; and I told him
that I would take $50, and Mr. White said, 'That is too
much.' 'Very well,' I said, 'I don't care for the job at
all; all that I ask of you is to put the mill in as good
condition as when you received it; as far as sawdust and
rubbish and everything of that sort is concerned.' *　*　*
I says to Mr. White, 'I supposed you were left here to
settle up with me, and turn this property over.' He says:
'I have nothing to do with it. I have no right to do it.
Mr. Watson intended to be here to-day, but he was sick,
but he will be here in a day or two, and he will fix the
matter up, and turn the property over to you in good
shape.' In the mean time he expected some local parties
there to draw away some of the edgings and slabs that

was left there. He said they wanted them for wood.
* * * He spoke about the team. He wanted I should
take the team. He said they were out of feed, and had
no hay, and it would be an unnecessary expense for them
to go and buy hay, as they had nothing to do for it.
He said Mr. Watson would be up in a day or two, and
he wanted me to take the team and take care of it, and
I said, 'I don't want to accept the team so it will in
any way hold me in accordance with that lease, as accept-
ing the mill back or anything of that sort.' He said
that wouldn't make any difference; that would be all
right; there wouldn't be any trouble about that, anyway.
Mr. Watson would be up in a day or two, and everything
would be settled up satisfactory. * * * The next
morning, July 12, I had a conversation with him at
the hotel. There was an unsettled account about some
wood that they had burned up, that I had forgotten.
He said he would have it arranged, and I would get it
when they sent me the amount due me on the mill. He
asked me then if I thought that $25 was not enough for
cleaning up the property, and I says, 'No, sir, it is not,'
and that was all that was said in regard to it at that
time, and he took the train and went south. The watch-
man was dismissed on the morning of the 12th. I did
not go near the mill on the next day, or pay any atten-
tion to it. They at that time had a lot of lumber in
the mill-yard. The mill burned down on the morning of
the 13th of July."

At this point, counsel for plaintiff was interrupted by
the court, and asked to explain how he expected to
recover on this evidence. Plaintiff's counsel then made
the following offer:

" We offer to prove that at the time of the fire there
was yet in the mill itself, and upon the rollways in and
about the operating portion of the mill, a considerable
quantity of the regular cut of lumber belonging to the
defendants, and not yet by them removed from the mill.
We also offer to prove that there was from 2,000 and
upwards of feet of logs yet in the yard adjacent to the
mill, uncut, good merchantable logs."

Counsel further stated that he was prepared to bring

the fire home to defendants, and to show why plaintiff
did not make a claim for damages at the time that he
received the balance of the $500, on July 23; and that
he was also prepared to show that there was fire in the
sawdust on July 11, and that the fire which destroyed
the mill originated in the rubbish. The court refused to
receive the testimony, holding that the mill had been
turned over to plaintiff on July 11, and that the obliga-
tion imposed upon defendants, by the lease, to maintain
a watchman and care for the mill ceased at that time,
the premises having been surrendered to plaintiff.

The court erred in finding, as a matter of law, that
the defendants had surrendered possession, and that plaint-
iff had assumed the care of the mill. Plaintiff had not
rested his case, did not claim to be entitled to recover
upon the case thus presented, and had advanced no theory
inconsistent with the case set forth in his declaration.
His contention was that defendants were still in posses-
sion when the fire occurred; that White had no author-
ity to surrender possession; that plaintiff had refused to
accept possession of a part of the premises.

The judgment is reversed, and a new trial ordered, with
costs.

The other Justices concurred.